IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

PRISCILLA GADSDEN,                    ) Civil Action No. 4:12-2530-DCN-TER
                                      )
              Plaintiff,              )
                                      )
       v.                             )
                                      ) **REPORT AND RECOMMENDATION**
CAROLYN W. COLVIN,[1] ACTING          )
COMMISSIONER OF SOCIAL                )
SECURITY,                             )
                                      )
              Defendant.              )
_____  )


## JURISDICTION

This is an action brought pursuant to Section 205(g) of the Social Security Act, as amended,

42 U.S.C. § 405(g), to obtain judicial review of a "final decision" of the Commissioner of Social

Security, denying Plaintiff's claim for Supplemental Security Income (SSI). The only issues before

the Court are whether the findings of fact are supported by substantial evidence and whether proper

legal standards have been applied.


## PROCEDURAL HISTORY

The Plaintiff, Priscilla Gadsden, filed an application for SSI on September 3, 2008,  alleging

disability beginning July 14, 2008.  Plaintiff requested a hearing before an administrative law judge

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin should be substituted for Michael J. Astrue as the Defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

(ALJ) after her claim was denied initially and on reconsideration. A hearing was held on December

10, 2010. The ALJ issued a decision on December 17, 2010, finding that Plaintiff was not disabled.

After the Appeals Council denied Plaintiff's subsequent request for review of the ALJ's decision,

the ALJ's decision became the Commissioner's final decision for purposes of judicial review under

42 U.S.C. § 405(g). See 20 C.F.R. § 404.981. Plaintiff filed this action on September 3, 2010.


## PLAINTIFF'S SPECIFIC ARGUMENTS

Plaintiff argues as follows:

1.    The ALJ failed to consider the combined effect of Ms. Gadsden's multiple impairments.

2.    The ALJ's credibility analysis was legally flawed.

3.    The ALJ assigned improper weight to the opinion of the consultative examiner.

(Plaintiff's brief).

## FACTUAL BACKGROUND/MEDICALS

Plaintiff was born March 1, 1976, and was thirty-two (32) years of age on the alleged

disability onset date. Plaintiff has at least a high school education and past relevant work as a

cashier, pharmacy technician, receptionist at a medical office, bank teller, and as a retail customer

service representative.

Plaintiff set out the medicals in her memorandum. Defendant incorporates Plaintiff's

summary of the medical evidence in her memorandum with one clarification that Plaintiff lists a

number of test results relating to her back pain recorded by Dr. Joseph Bartlett of the Charleston

Neck & Back Center which appear to suggest all the testing was conducted in February 2009 when

Dr. Bartlett's February 2009 report actually included tests results from testing conducted in July

2008, before Plaintiff underwent surgery. (Defendant's memo, p. 2). In her reply brief, Plaintiff agrees with the Defendant's clarification. Thus, the undersigned will set out the medical evidence as set forth by the Plaintiff for reference in this report and recommendation.

**Evidence Prior to the Onset Date.**

Mrs. Gadsden was treated at the Medical University of South Carolina's (hereinafter MUSC) Emergency Department on July 27, 2007, for a lump on the right side of her head. She also complained at the time of neck and shoulder pain and occasional numbness in her right arm along with occasional blurry vision. She noted to medical personnel that she had gained ten pounds in ten days. Doctors noted she had enlarged lymph nodes and diagnosed her with lymphadenitis (TR 237-238).

Ms. Gadsden visited Dr. Jeffrey Akhtar of Carolina Family Care four days later, July 31, 2007. Dr. Akhtar was Ms. Gadsden's primary care physician. She was bothered by her on-going weight gain and also her intrauterine device (IUD). She was told to follow up with her gynecologist, continue taking the antidepressant Effexor, and the medication for hypolipidemia (TR 338-339).

Mrs. Gadsden was seen by Dr. Ashlyn Savage at MUSC's Department of Gynecology on August 14, 2007, for a routine follow-up visit. She complained of weight gain. Her depression medications had recently been changed.

Mrs. Gadsden returned to Dr. Akhtar on September 14, 2007. She complained of lumbar pain which increased when she tried to exercise. She was told to increase her dosage of Lortab for two weeks, to re-start the gastric by-pass diet, and to have her endocrine hormone levels checked. The hormone assay of her cortisol levels were normal, and TSH and free T4 were also checked at this time (TR 336-337; 351-352).

Ms. Gadsden was seen at MUSC's plastic surgery clinic on September 24, 2007. She complained of excessive skin (pannus) about her abdomen, which she wanted removed. She told Dr. Mary Lester that this excessive skin caused rashes and irritation. Dr. Lester noted Mrs. Gadsden did indeed have a large, overhanging pannus (TR 300) which was later surgically removed on December 12, 2007 (TR 268). Mrs. Gadsden was seen for a follow up visit on December 17, 2007 by Dr. Lester. The doctor noted that her patient was doing well, but decided to wait to remove the numerous drains in place in the surgical area (TR 299). Dr. Lester saw Mrs. Gadsden again on December 20, 2007, but although she was pleased with her recovery, she again decided to let the drains remain in place (TR 298).

Mrs. Gadsden visited Dr. Akhtar on December 31, 2007, for another "post op" appointment. She complained of chronic back pain, which she described as an intermittent sharp pain that increased with certain positions or prolonged sitting or walking. She did report decreased anxiety levels (TR 334-335). Doctor's notes indicate her lipid profile was good. In her complete blood count profile, white blood cell count was noted to be high. She was slightly anemic but felt no treatment was warranted at that time (TR 349-350).

On April 30, 2008, Ms. Gadsden returned to Dr. Akhtar. She complained of chronic back pain, malaise, high blood pressure, and depression. Diagnoses included malaise, depression, weight gain, edema, shortness of breath, migraine headaches, and insomnia (TR 332-333). Her complete blood count showed her white blood cell count to be low as well as her red blood count. Also low were her hemoglobin and hematocrit. Her RDW was high. Her free T4, which relates to thyroid performance was low at this time (TR 347-348).

Mrs. Gadsden visited West Ashley Bone and Joint Center, a division of MUSC, on June 25,

2008, for spinal x-rays ordered by Dr. Akhtar. The x-ray showed new evidence of degenerative disc disease at L4-5 and L5-S1 (TR 340).

On June 28, 2008, Mrs. Gadsden reported to the emergency department of MUSC. She was admitted with sharp pain in her lower back which radiated into her left thigh. She attributed the pain to her spinal stenosis (TR 235-236). She was given medication for pain and discharged home.

Mrs. Gadsden began physical therapy at Charleston Neck & Back Center on July 11, 2008. Her pelvic, lumbar and sacral regions were manipulated. She also was treated with supervised electric stimulation for ten minutes, and manual therapy for thirty minutes (TR 247- 248). She returned the following day and reported no improvement. Her previous symptoms were reviewed and an MRI was ordered. She received the same course of treatment as she had previously (TR 249-250). The same course was once again administered on July 16, 2008 (TR 251-252).

**Evidence generated after the onset date.**

On July 14, 2008, Ms. Gadsden saw Dr. Akhtar and complained of left hip pain, abdominal pain, stress, financial issues, and back pain. She expressed concern because she needed refills of her antidepressant, Effexor, and was worried she would not be able to afford them (TR 330-331).

On July 17, 2008, Mrs. Gadsden was seen By Dr. Andrew Geer at Roper-St Francis for an epidural steroid injection at L4-L5 to treat her lumbar radiculopathy (TR 320-324). The same day, Ms. Gadsden reported for a lumbar MRI at the behest of the Commissioner (TR 241). The report noted L4/5 left paracentral inferior extrusion causing moderate central and left recess stenosis, with contact and posterior deflection (displacement) of transiting left L5; a small segmental lipoma of the cauda equine (clinical significance unknown) and various lesser findings including disc bulge at L5/S1 and face hypertrophy and mild central narrowing at L3/4.

Mrs. Gadsden reported to MUSC on July 25, 2008, for a pre-operative visit at the Orthopedic Spine Clinic. Doctors planned to perform a L4-5 laminectomy (TR 295). An ECG ordered on this date by Dr. John Glaser was normal (TR 239). Mrs. Gadsden reported low back pain, left leg numbness and weakness which had been tolerable until the prior two months. Her pain now would suddenly escalate and radiate to her lower left extremity. She also felt numbness on the posteriolateral side of her left leg. She gave her pain a rating of "eight" on the 0 to 10 pain scale. Physical therapy and the epidural nerve block were noted to have been of no relief to her. The results of the recent MRI were reviewed, showing the lower lumbar spinal stenosis, and the herniated L4/5 intervertebral disc. A lumbar spine laminectomy was therefore planned as well as a discectomy with a possible fusion (TR 266-267).

Operative notes from Mrs. Gadsden's July 31, 2008, surgery indicate she underwent a left L4- L5 decompression with a partial laminectomy and removal of a large piece of a disc fragment. Many smaller pieces of disc fragments were removed as well. (TR 263-264).

Mrs. Gadsden had her post-surgical follow up at Carolina Family Care on August 19, 2008. She still complained of back pain, as well as left hip pain, and a desire to lose weight. She was diagnosed with back pain, hypothyroidism, stress, weight loss issues, high blood pressure, and anxiety (TR 328-329). Blood work indicated that her white and blood cell counts were both low. Her platelet and RTW readings were high (TR 328-329; 344-346).

Mrs. Gadsden was seen at Dr. Barlett's office on August 26, 2008. Medical notes indicate her intervertebral disc syndrome had resolved as well as improvement of the paralumbar musculature and the lumbar segmental dysfunction. Some physical therapy was administered; it was advised she only undergo gentle mobilization for rehabilitation and no forceful manipulation for

6

three weeks (TR 253-254).

Mrs. Gadsden returned to Dr. John Glaser the following day, approximately four weeks after the L4-L5 decompression (TR 293-294). She reported some recurrence of left leg pain. While she reported some improvement since the surgery, she still complained of back pain and right leg numbness. The right leg pain was stated to be diffuse and intermittent. The back pain was described as more constant; worse when sitting, and was in the lower sacral region. Mrs. Gadsden stated she felt a lump in the area of her back pain. It was decided she should have no more physical therapy until the radicular pain was reduced.

On September 15, 2008, Mrs. Gadsden had her annual gynecological check up with Ashlyn Savage, MD, of MUSC. Mrs. Gadsden complained of hot flashes, heavy and long menses despite placement of a Mirena IUD, and fatigue. Dr. Savage noted that an extensive endocrine work up had ruled out ovarian dysfunction and rare disorders but that long-standing anemia had become a problem for Mrs. Gadsden. (TR 273; 289-292).

MUSC Orthopedics saw Mrs. Gadsden on September 26, 2008. She continued with leg and back pain problems. Dr. Christopher Merrell noted her prior L4-L5 decompression on July 31, 2008. Dr. Merrell also noted she had a fair amount of trouble "between her work secondary to pain and with the general activities of daily living." Mrs. Gadsden equated the pain with an electrical shooting sensation. The doctor's diagnosis was left-sided leg pain consistent with lumbar radiculitis. He ordered a left-sided lumbar transforaminal epidural steroid injection (TR 286-288).

Mrs. Gadsden returned to her Dr. Savage on September 29, 2008 and the two discussed total hysterectomy versus ablation (TR 282-283).

Mrs. Gadsden returned to Dr. Savage on October 17, 2008 for a pre-op visit. Although the

doctor told her the anemia perhaps could have other causes, including malabsorption from her earlier gastric by-pass, the heavy and prolonged menses were very problematic for Mrs. Gadsden and she elected to pursue a hysterectomy (TR 276-279).

On October 29, 2008, Mrs. Gadsden underwent a total vaginal hysterectomy. The procedure was without complication and Ms. Gadsden was permitted to leave under the care of her family the same day (TR 260-261). On December 12, 2008, Mrs. Gadsden had a normal post-op visit (TR 275).

Dr. Akhtar saw Mrs. Gadsden on January 23, 2009. She was diagnosed with back pain, depression, hypothyroidism, anemia, and high blood pressure (TR 326-327). Blood work ordered at this visit showed the following were low: hemoglobin, hematocrit, MCH, red blood count, iron, ferritin, MCHC, and basophils. Her blood was high in platelets, however. (TR 304 -308; 317).

Mrs. Gadsden returned to Dr. Barlett on February 9, 2009. She complained of stiffness, weakness and numbness. The report incorporated the examination findings from July 2008. In the history portion of the report, it was noted her pain originated from her spine, ribs, pelvis, left lower back, and left gluteal region. On the 0 to 10 pain scale, she said that at rest, her pain level was an eight. When she attempted activity, it became a ten. She described pins and needles that radiated to her left upper leg. Palpation revealed lumbar hypomobility with segmental dysfunction at L5, L4 and L3. There was mild to moderate tenderness at the spinous or facet joint with a recent history of mild to moderate trauma. It was felt she could have a possible sprain of the lumbar supra/interspinous ligaments. Posterior palpation of the paralumbar musculature found spasm, hypertonicity, and/or trigger points with a history of recent trauma. Also possible was a strain of the paralumbar structure on the left side. The sacral finding revealed sacral hypomobility, sacroiliac/sacrococcygel segmental dysfunction. The pelvic finding showed mild to moderate

8

tenderness. Palpation of the pelvic region revealed pelvic hypomobility, pelvic segmental dysfunction on the left side, moderate to severe tenderness over the sacroiliacal articulation with a recent history of moderate to severe trauma, including a possible trauma.

The report set out the following results from the July 9, 2008, examination. Straight leg raise on the left indicated that radicular pain began or exacerbated at 35 to 70 degrees of hip flexion. This was felt to be indicative of a possible sciatic nerve root irritation by intervertebral disc pathology or an indradural lesion. Kemp's Test was performed on her left side. It produced low back pain which had a radicular component on the same side of oblique bending. This was felt to be indicative of a lateral disc lesion. Braggard's Test was also performed on Mrs. Gadsden's left side. Pain was produced with 65+ degrees of dorisiflexion of the foot. This was felt to be indicative of intervertebral joint pain due to possible joint dysfunction. An examination of the claimant's spine, rib, and pelvis motor functions was found to be normal; however, a sensory/reflex assessment at L5 of the spine, ribs, and pelvis indicated decreased sensitivity to sensory input at the L5 dermatome. This was indicative of a lesion at the L5 nerve root. The objective problem was determined to be lumbar segmental dysfunction, spasm in the paramusculature, lumbosacaral strain, intervertebral disc syndrome, lesion of the L5 nerve root, sacroiliac segmental dysfunction, and pelvic joint dysfunction. Secondary problems were found to be lumbalgia and disturbance of skin sensation, resulting in a sensation of pins and needles.

Mrs. Gadsden's lumbar segmental dysfunction, sacroiliac segmental dysfunction, and pelvic joint dysfunction were to be manipulated utilizing the "Pro Adjuster" device three time per week for one month or until she reached maximum medical improvement. The spasm of her paralumbar musculature, the lesion at her L5 nerve root, her intervertebral disc syndrome, and her lumbrosacral

strain were to be treated with supervised ultrasound, supervised electrical stimulation, and manual therapy; also three time a week for one month or until Mrs. Gadsden reached maximum medical improvement (TR 244-246).

Dr. Joseph Barlett referred Mrs. Gadsden to Tri County Radiology Associates, where she was seen on September 17, 2009. She underwent a lumbar spine MRI with and without contrast. The MRI indicated disc bulge and mild exit and recess narrowing at variously levels, and a recess scar which, it was noted, could affect the transiting L5 nerve roots at L4/5. (TR 376).

On that same day, September 17, 2009, Mrs. Gadsden returned to Carolina Family Care. She complained of back pain, depression, weight gain, a possible urinary tract infection, possible anemia, and on-going hypothyroidism. She had laboratory work performed that same day. Irregular readings included low levels of hemoglobin, hematocrit, red blood cells, and basolymph, and high levels of platelets, eoslymph, alkaline and RDW (TR 390-394).

Mrs. Gadsden had her annual gynecological visit at MUSC with Dr. Savage on October 12, 2009. The doctor noted hyperpigmentation on her patient's face. Mrs. Gadsden complained of decreased libido, hot flashes, weight gain, and night sweats. Dr. Savage ordered testing of Mrs. Gadsden's FSH levels to rule out premature ovarian failure due to her hysterectomy.

Mrs. Gadsden returned to Dr. Akhtar on October 22, 2009. She complained of back pain, dermatitis, insomnia, and weight gain. She also complained of painful urination, but tested negative for a urinary tract infection (TR 388-389).

Mrs. Gadsden had x-rays taken at Tri County Radiology Associates on December 22, 2009. The two views of her lumbar spine showed mild dextroscoliosis, L5-S1 moderate disc narrowing, caudal facet hypertrophy and L5-S1 spondylosis (TR 396).

That same day, Mrs. Gadsden was examined by Dr. Daniel Bates at the behest of the Commissioner. Dr. Bates' diagnoses included displacement of the lumbar intervertebral disc without myelopathy, hypertension, hypothyroidism, obesity, migraine headaches, and depression (TR 398-401). He completed a brief interview and basic review of symptoms. Dr. Bates had no prior treatment notes and no imaging reports available for his review. His examination consisted of a brief interview and brief review of symptoms. Dr. Bates opined, based on his exam that Ms. Gadsden may have some limitation with prolonged standing and lifting. He further opined that Ms. Gadsden "would be able to perform clerical duties where she could be comfortably seated" (TR 401).

Dr. Akhtar saw Mrs. Gadsden again on April 28, 2010. Problems included low back pain, anemia, depression, headaches, malaise, and sinusitis. Her lab work was indicative of anemia (TR 428-429; 435-436).

Ms. Gadsden returned to Dr. Akhtar on September 10, 2010. She complained of low back pain, abdominal pain, on-going depression, issues with her weight, and attention deficit disorder, insomnia, and neck pain. Dr. Akhtar noted a CT scan might be needed. He also treated her for her back pain, and ordered blood work, which indicated her TSH, a thyroid hormone, was low (TR 430-434).

The Defendant summarized the consultative and opinion evidence as follows:

In February 2009, state agency psychologist, Michael Neboschick, Ph.D., reviewed the medical evidence of record and opined that Plaintiff's depression was not severe, and imposed only mild limitations in activities of daily living, social functioning, and maintaining concentration, persistence, and pace. (Tr. 353-65). Dr. Neboschick explained that Plaintiff's allegations regarding the severity of her depression were "not wholly credible," noting that she had never been

hospitalized for psychiatric problems nor even seen a mental health specialist, other treatment records showed consistently normal and appropriate affect, and that, by her own account of her daily activities, she was able to function "independently, appropriately, and effectively on a sustained basis." (Tr. 365). In December 2009, state agency psychologist Lisa Clausen, Ph.D. concurred with this assessment. (Tr. 404-16).

In March 2009, Mary Lang, M.D., reviewed the medical evidence of record and opined that Plaintiff was capable of performing light work, but could only occasionally climb, balance, stoop, kneel, crouch, or crawl. (Tr. 368-69). She discussed each of Plaintiff's impairments in her explanation of this opinion, stating that Plaintiff's back problems imposed the most significant limitations and that her other impairments would not have as much of an effect on her functioning. (Tr. 368-69, 372).

In December 2009, consultative physician, Daniel Bates, M.D., examined Plaintiff. (Tr. 398-403). Inspection of the lumbar spine revealed "normal lumbar lordosis" and generalized tenderness; however, her gait, stability, motor strength, and range of motion of the cervical, thoracic, and lumbar spine and all extremities were all normal. (Tr. 401-03). Cardiovascular and neurological examinations were also normal. (Tr. 400-01). Relying on his findings as well as Plaintiff's narrative of her medical history, he listed her diagnoses as displacement of the lumbar intervertebral disc without myelopathy, hypertension, hypothyroidism, obesity, migraine, and neurotic depression. (Tr. 401). Dr. Bates opined that Plaintiff "may have some limitation with prolonged standing and lifting based on [her back] symptoms," but that she "[w]ould be able to perform clerical duties where she could be comfortably seated," and that her various medical problems "appear[ed] to be well controlled on current medications." (Tr. 401).

In December 2009, state agency physician Jim Liao, M.D., reviewed an updated medical record, which included Dr. Bates's report, and concurred with Dr. Lang's assessment. (Tr. 418-25). He further opined that many of Plaintiff's symptoms from her various impairments appeared to be either controlled or controllable with medication or other treatment. (Tr. 423).

## DISABILITY ANALYSIS

In the decision of March 24, 2011, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since July 14, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: back disorder, anemia, obesity, hypertension, migraine headaches, and hypothyroidism  (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a). Specifically, the claimant is able to lift and carry up to 10 pounds occasionally and lesser amounts frequently, sit for six hours in an eight-hour day, and stand and walk occasionally. However, the claimant can only perform unskilled work requiring no more than occasional postural movements with an option to alternate position at will.

6.    The claimant is unable to perform any past relevant work. (20 CFR 404.1565).

7.    The claimant was born on March 1, 1976 and was 32 years old, which is defined as a younger individual age 18-44, on the alleged disability onset

13

date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 14, 2008, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 12-19).

Under the Social Security Act (the Act), 42 U.S.C. § 405 (g), this court's scope of review of the Commissioner's final decision is limited to determining: (1) whether the decision of the Commissioner is supported by substantial evidence, and (2) whether the legal conclusions of the Commissioner are correct under controlling law. Myers v. Califano, 611 F.2d 980, 982-83 (4th Cir. 1988); Richardson v. Califano, 574 F.2d 802 (4th Cir. 1978). "Substantial evidence" is that evidence which a "reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 390. Such evidence is generally equated with the amount of evidence necessary to avoid a directed verdict. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984). The Court's scope of review is specific and narrow. It does not conduct a de novo review of the evidence, and the Commissioner's finding of non-disability is to be upheld, even if the Court disagrees, so long as it is supported by substantial evidence. 42 U.S.C. § 405 (g) (1982); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir.

1972).

The general procedure of a Social Security disability inquiry is well established. Five questions are to be asked sequentially during the course of a disability determination. 20 C.F.R. §§ 404.1520, 1520a.  An ALJ must consider: (1) whether the claimant is engaged in substantial gainful activity, (2) whether the claimant has a severe impairment, (3) whether the claimant has an impairment which equals a condition contained within the Social Security Administration's official listing of impairments (at 20 C.F.R. Pt. 404, Subpart P, App. 1), (4) whether the claimant has an impairment which prevents past relevant work, and (5) whether the claimant's impairments prevent him from any substantial gainful employment.

Under 42 U.S.C. §§ 423 (d)(1)(A) and 423(d)(5), pursuant to the Regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." See 20 C.F.R. § 404.1505(a); Blalock, 483 F.2d at 775.

If an individual is found not disabled at any step, further inquiry is unnecessary. 20 C.F.R. § 404.1503(a); Hall v. Harris, 658 F.2d 260 (4th Cir. 1981). An ALJ's factual determinations must be upheld if supported by substantial evidence and if proper legal standards were applied. Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986).

A claimant is not disabled within the meaning of the Act if he can return to his past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82-62. The claimant bears the burden of establishing his inability to work within the meaning

of the Act. 42 U.S.C. § 423 (d)(5). He must make a prima facie showing of disability by showing he was unable to return to his past relevant work. Grant v. Schweiker, 699 F. 2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the national economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy that the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. Id. at 191.

## ARGUMENTS/ANALYSIS

### Credibility

Plaintiff argues that the ALJ's credibility analysis was legally flawed. Plaintiff contends the ALJ relied almost entirely on the proposition that Plaintiff did not receive constant treatment despite multiple references in the record to financial hardship. Specifically, Plaintiff argues that the ALJ failed to evaluate whether her allegation that she could not afford further treatment was sufficient good cause for her supposed lack of treatment. Plaintiff asserts that the only subjective evidence the ALJ considered was that she stated she was able to help with laundry, drive a vehicle, perform a little housework, cook a little and go shopping. Plaintiff argues that ". . . even the impairments which the ALJ found severe, he later  analyzed as having little or no impact on Ms. Gadsden's ability to function which is facially inconsistent." (Plaintiff's brief).

Defendant argues that the ALJ properly evaluated Plaintiff's credibility. Defendant asserts

16

that Plaintiff is correct that an ALJ generally should not penalize a claimant for failure to pursue treatment without first determining whether good cause exists and that an inability to afford treatment may constitute good cause. However, Defendant asserts that Plaintiff provided very little evidence from which any conclusion could be drawn about the effects of her hypertension, hypothyroidism, anemia, or migraines, or about the condition of her back post-surgery. Based on the medical evidence, Defendant argues that, as a whole, the ALJ's credibility determination is consistent with SSR 96-7p and supported by the record.

Under Craig v. Chater, 76 F.3d 585, 591-96 (4th Cir. 1996), subjective complaints are evaluated in two steps. First, there must be documentation by objective medical evidence of the presence of an underlying impairment that would reasonably be expected to cause the subjective complaints of the severity and persistence alleged. Not until such underlying impairment is deemed established does the factfinder proceed to the second step: consideration of the entire record, including objective and subjective evidence, to assess the credibility of the severity of the subjective complaints. See also 20 C.F.R. § 404.1529(b); Social Security Ruling (SSR) 96-7p, 61 Fed. Reg. 34483-01, 34484-85. The ALJ found at Craig's step one that Plaintiff's impairments could be capable of producing the symptoms that he alleged and, accordingly, proceeded to step two. It is here that Plaintiff has an issue.

The ALJ set out a summary of Plaintiff's medical records and testimony at the hearing and concluded that Plaintiff's allegations that she is unable to perform all work activity are not credible. The ALJ may choose to reject a claimant's testimony regarding her pain or physical condition, but he/she must explain the basis for such rejection to ensure that the decision is sufficiently supported by substantial evidence. Hatcher v. Sec'y, Dep't of Health & Human Servs., 898 F.2d 21, 23 (4th

Cir.1989) (quoting Smith v. Schweiker, 719 F.2d 723, 725 n. 2 (4th Cir.1984)). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. However, it is well settled that a claimant for Social Security benefits should not be "penalized for failing to seek treatment [he] cannot afford." Lovejoy v. Heckler, 790 F.2d 1114, 1117 (4th Cir.1986). Social Security Ruling 96–7P expressly addresses the situation where a claimant asserts that he has not pursued medical treatment because of a lack of financial resources. See SSR 96–7P, 1996 WL 374186. In such a situation, the fact finder is admonished from drawing "any inferences about an individual's symptoms and their functional effects" from a failure to pursue medical treatment "without first considering any explanations that the individual may provide ...." Id. at *7.

In this case, the Plaintiff referenced her financial situation several times during the hearing stating that "I've only been able to see my primary care physician the past two years because I haven't had insurance for the past two years, and I just recently got approved for Medicaid, so that's how I was able to see the neurosurgeon yesterday." (Tr. 34). The ALJ did not follow up with any questions regarding her financial situation and medical care. When asked if she felt any differently over the last two years, the Plaintiff responded, "yes, I'm more and more uncomfortable as time goes on. I'm just not able to–I wasn't able to get the attention I need so my primary physician was doing his best to help me stay as comfortable as he could." (Tr. 35). When asked by the ALJ if she had gone to any counseling in 2007, 2008 or anytime in there, Plaintiff responded:

> No, sir. They've offered it to me, but I by choice didn't go because
> I couldn't afford it. My husband and I also had–well, lack of money,

18

we filed bankruptcy the end of April. He's been laid off pretty much
on and off for the past two years since I had my surgery. He was laid
off a complete year after my surgery. That's why I had the lack of
insurance. I went from having two good insurances to none.

(Tr. 36).

Again, there were no follow-up questions by the ALJ about her finances or her ability to

seek treatment through free or low-cost medical services. In the ALJ's decision, he stated the

following with regard to her credibility while referencing the lack of treatment:

While the claimant's medical records note a history of back pain, the
records also indicate that after having back surgery to repair her disc
bulge at the L4/5 level, the claimant only sought minimal additional
treatment for her back pain. An MRI was taken in July 2008 which
revealed disc bulges at L4/5 and L5/S1, mild central narrowing, and
stenosis at the L4/5 level. She was seen four times at Charleston
Neck and Back Center, and had back manipulation work performed,
but did not continue treatment, although the physician directed her to
continue treatment for an additional three weeks. (Exhibit 3F).
Instead she was seen at MUSC where a physical examination showed
that the claimant walked slow and ambulated with a limp. In July
2008, she underwent a left L4/5 decompression with partial
hemilaminectomy and removal of disk fragment after being
diagnosed with a L4/5 left disk herniation.

. . .

Other than reporting back pain to her primary care physician, the
claimant received no other diagnostic testing or physical examination
concerning her back until another MRI was taken in September 2009.

. . .

Since the claimant's lower back surgery in July 2008, the claimant
has had two additional MRIs of her lumbar spine, neither of which
showed any worsening problems. Other than these MRIs and
complaints to her primary care physician of back pain, the claimant
has had no x-rays or other objective testing conducted concerning her
back. Other than being prescribed pain medication, the claimant was
not given anything further to help alleviate her pain symptoms. She
did not seek additional treatment, was not referred to any back

19

specialists or to any pain management centers, and did not explore any other options to help with her pain. Despite the claimant's complaints of pain, medical records after her lumbar surgery consistently showed no joint or muscle pain, stiffness or swelling, and further noted that the claimant walked with a normal gait.

. . . The claimant also informed Dr. Bates that she has been suffering from migraine headaches. However, the claimant has never seen a specialist, sought alternative medical treatment, or received any diagnostic testing with regards to her migraine headaches.

(Tr. 15-16).

In this case, Plaintiff testified to  a lack of funds and insurance for treatment and that once she was approved for medicaid, she went to a neurosurgeon which was the day before her hearing. (Tr. 34).  However, there is no further information in the record concerning whether there were low or no cost alternatives of which Plaintiff failed to take advantage. To the extent that the ALJ discounted Plaintiff's credibility based on her lack of treatment, it is unclear whether it was proper to do so. Therefore, remand is necessary for the fact finder to address the issue of Plaintiff's financial condition and the alleged impact of this on her failure to pursue medical treatment and obtain medical prescriptions or the gaps in treatment. To the extent the ALJ on remand continues to consider Plaintiff's failure to pursue medical treatment as evidence weighing against her credibility, it is necessary that specific factual findings be made concerning what resources were available to Plaintiff and whether her alleged inability to pay for treatment, diagnostic studies and prescription medications contributed to her failure to seek medical treatment for his various impairments. Accordingly, it is recommended that this case be remanded on this issue.

The undersigned will continue with an analysis of Plaintiff's other issues in the event the District Judge disagrees with this recommendation.

**Combination of Impairments**

Plaintiff argues that the ALJ failed to adequately consider the combined effects of her impairments. Plaintiff avers that not only did the ALJ fail to consider the combined effect at the Listing stage but failed to consider the combination of all limitations at the RFC stage. Defendant argues the ALJ properly considered the combined effect of Plaintiff's impairments.

In order for a reviewing court to determine whether the Commissioner based a decision on substantial evidence, "the decision must include the reasons for the determination ...." *Green v. Chater*, 1995 U.S.App. LEXIS 21970, *7, 1995 WL 478032 (4th Cir.1995) (*citing Cook v. Heckler*, 783 F.2d 1168, 1172 (4th Cir.1986)). When dealing with a claimant with more than one impairment, the Commissioner "must consider the combined effect of a claimant's impairments and not fragmentize them." *Walker v. Bowen*,  889 F.2d 47, 50 (4th Cir.1989) (citations omitted). This requires the ALJ to "adequately explain his or her evaluation of the combined effects of the impairments." *Walker,* 889 F.2d at 50 (citing *Reichenbach v. Heckler*, 808 F.2d 309, 312 (4th Cir.1985)). *But see, Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011); *Browning v. Sullivan*, 958 F.2d 817, 821 (8th Cir. 1992); and, *Gooch v. Secretary of Health & Human Services*, 833 F.2d 589, 592 (6th Cir. 1987). Whether or not the impairments are found to be severe, the ALJ must consider the severe and nonsevere complaints and impairments in combination in determining the Plaintiff's disability. Furthermore, "[a]s a corollary, the ALJ must adequately explain his or her evaluation of the combined effects of the impairments." *Walker*, 889 F.2d at 50. The ALJ's duty to consider the combined effect of Plaintiff's multiple impairments is not limited to one particular aspect of its review, but is to continue "throughout the disability process." *20 C.F.R. § 404.1523.*

In this case, the ALJ found that Plaintiff's back disorder, anemia, obesity, hypertension, migraine headaches, and hypothyroidism were severe impairments. The ALJ discussed in detail

21

Plaintiff's depression and found that it was not a severe impairment because it no more than minimally affected her ability to perform work related activity.  At step three of the sequential evaluation, the ALJ found  that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the criteria of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526)." (Tr. 13).  The ALJ discussed Plaintiff's hypertension and the Listings he considered, Plaintiff's back disorder along with her obesity, her hypothyroidism, and her anemia.  Unlike the ALJ in *Walker* and its progeny, the ALJ in this action discussed each of Plaintiff's impairments and performed a detailed RFC analysis that demonstrates the ALJ considered Plaintiff's impairments in combination. The ALJ's decision accounted for Plaintiff's combination of impairments in determining that Plaintiff had the RFC to perform sedentary work with the following restrictions: "the claimant can only perform unskilled work requiring no more than occasional postural movements with an option to alternate position at will." (Tr. 13). The ALJ states that he considered the entire record and all the symptoms. (*Id*.).  The ALJ discussed Plaintiff's back pain in detail. He then stated that "[a]long with her back pain, the claimant has also been treated for a number of other severe impairments, including anemia, hypertension, migraine headaches, hypothyroidism, and obesity." (Tr. 15). The ALJ then continued to discuss her impairments with the medical evidence. The ALJ discussed Plaintiff's obesity and how it affected her manipulation. (Tr. 16). The ALJ concluded as follows:

> In sum, the above residual functional capacity assessment for sedentary work with additional limitations is supported by the weight of the medical evidence or record. The claimant's allegations have been taken into account in limit[ing] her to sedentary work; however, the undersigned cannot find the claimant's allegation that she is unable to perform all work activity to be credible.

(Tr. 17).

The court finds the ALJ's discussion and analysis to be sufficient to demonstrate that he considered Plaintiff's impairments in combination. The decision includes sufficient findings regarding the combination of her impairments for the court to properly review the ALJ's conclusion on this issue. *See Thornsberry v. Astrue*, C/A No. 4:08–4075–HMH–TER, 2010 WL 146483, *5 (D.S.C. Jan.12, 2010) (unpublished) ( "Accordingly, the court finds that while the ALJ could have been more explicit in stating that his discussion dealt with the combination of Thornsberry's impairments, his overall findings adequately evaluate the combined effect of Thornsberry's impairments. Any error on the part of the ALJ in failing to use explicit language is harmless."). When considering whether the ALJ properly considered the combined effect of impairments, the decision must be read as a whole. *See Brown v. Astrue*, No. 10–1584, 2012 WL 3716792, *6 (D.S.C. Aug.28, 2012) ("Accordingly, the adequacy requirement of Walker is met if it is clear from the decision as a whole that the Commissioner considered the combined effect of a claimant's impairments.") (*citing Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. Aug.14, 1995)).  Also, the ALJ sufficiently addressed Plaintiff's combined impairments in his RFC analysis to enable the court to properly review her conclusion, including the combined effects, and there is substantial evidence to support the ALJ's decision in this regard. Thus, it is recommended that the decision be affirmed based on this issue.

## Weight Assigned to the Opinion of the Consultative Examiner

Plaintiff argues that the ALJ erred in finding that the opinion of Dr. Daniel Bates, consultative examiner, was supported by the weight of the other evidence of record and accorded it "significant weight."  Plaintiff asserts that Dr. Bates' statement that she may have some limitation with prolonged standing and lifting was a medical opinion that the ALJ should have and did

consider. However, Plaintiff avers that Dr. Bates' further statement that she "would be able to perform clerical duties where she could be comfortably seated" was merely a lay opinion that she was not disabled. Plaintiff contends that Dr. Bates conducted no medical examination, and reviewed no relevant evidence which might support his opinion as to her mental function.

The Defendant counters that the ALJ properly evaluated the opinion of consulting physician Dr. Bates. Defendant avers that the record indicates that the ALJ did not place undue weight on Dr. Bates' opinion that Plaintiff could work a clerical job. Additionally, Defendant asserts that the ALJ did not base his step-four and step-five determination on this statement but relied on the testimony of the vocational expert that an individual with Plaintiff's background and limitations could perform several specific jobs including machine tender, assembler, and order clerk and that the ALJ's questions to the vocational expert did not reflect special significance to this one statement.

The Social Security Administration's regulations provide that "[r]egardless of its source, we will evaluate every medical opinion we receive." 20 C.F.R. § 404.1527(d). Generally, more weight is given to the opinions of examining physicians than non-examining physicians. More weight is given to the opinions of treating physicians since they are more likely to be able to provide a detailed, longitudinal picture of a claimant's medical impairment. See 20 C.F.R. §§ 404.1508 and § 404.1527(d)(2). The medical opinion of a treating physician is entitled to controlling weight, i.e. it must be adopted by the ALJ, if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. See 20 C.F.R. § 404.1527(d)(2), SSR 96-2p, and Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). Thus, "[b]y negative implication, if a physician's opinion is not supported by clinical evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).

24

Under such circumstances, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d at 178 (citing Hunter v. Sullivan, 993 F.2 31, 35 (4th Cir. 1992).

In determining what weight to give the opinions of medical sources, the ALJ must apply all of the factors in 20 C.F.R. § 404.1527(d)(1)-(6), which are: whether the source examined the claimant; whether the source has a treatment relationship with the claimant and, if so, the length of the relationship and the frequency of examination; the nature and extent of the treatment relationship; the supportability and consistency of the source's opinion with respect to all of the evidence of record; whether the source is a specialist; and, other relevant factors. See SSR 96-2p; Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006). Furthermore, 20 C.F.R. § 404.1527(d)(2) states: "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." SSR 96-2p requires that "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

In the ALJ's decision, he found the following with regard to the medical opinions:

> The claimant's primary care physician, Dr. Akhtar, opined that while the claimant was suffering from depression, she was oriented to time, person, place and situation, and her thought process was intact and her thought content was appropriate. Further, he found that her mood and affect was normal, and her attention, concentration, and memory were all good. He opined that she would exhibit a slight work-related limitation in function due to her depression, but that she had improved while on Pristiq. Dr. Akhtar's opinion is supported by his treating relationship with the claimant and the weight of the other evidence of record. Therefore, it has been accorded significant

> weight.
>
> Dr. Bates conducted a consultative examination report and opined in December 2009 that while the claimant may have some limitation with prolonged standing and lifting based on her symptoms of back pain, she would be able to perform clerical duties where she could be comfortably seated. Further, he opined that her medical problems appeared to be well controlled on current medications. While the issue of disability is one reserved for the Commissioner, Dr. Bates' opinion is supported by the weight of the other evidence of record, and has therefore been accorded significant weight.

(Tr. 17).

The ALJ discussed Plaintiff's testimony and the medical evidence in detail before reaching his conclusion. The ALJ did note that Dr. Bates' opined that Plaintiff would be able to perform clerical duties but stated that the issue of disability is reserved for the Commissioner while finding that his opinion was supported by the weight of other evidence of record. (Tr. 17). The ALJ also accorded significant weight to the opinion of Plaintiff's treating physician, Dr. Akhtar. (*Id.*) Additionally, the ALJ relied on the testimony of the VE finding Plaintiff could perform the requirements of representative occupations such as machine tender, assembler, and order clerk. (Tr. 18). Based on the record, the ALJ did not err in according significant weight to the opinion of Dr. Bates while also according significant weight to the opinion of her treating physician and relying on the VE's testimony concerning jobs she could perform.

## **CONCLUSION**

In conclusion, it may well be that substantial evidence exists to support the Commissioner's decision in the instant case. The court cannot, however, conduct a proper review based on the record presented.

Accordingly, IT IS RECOMMENDED that the Commissioner's decision be REVERSED and that this matter be REMANDED TO THE COMMISSIONER PURSUANT TO SENTENCE FOUR for further proceedings in accordance with this opinion.

Respectfully Submitted,

s/Thomas E. Rogers, III

December 18, 2013                                  Thomas E. Rogers, III
Florence, South Carolina                           United States Magistrate Judge